**DOWGATE STEAMSHIP CO., Limited, v. ARBUCKLE et al.**

(District Court, S. D. New York. November 27, 1907.)

**1. SHIPPING—SHORT DELIVERY OF CARGO—EVIDENCE CONSIDERED.**

The prima facie case made by a bill of lading signed by the master of a vessel as to the number of bags of coffee received on board at a loading port, corroborated by the testimony of the charterer's agent and others having occasion to keep track of such number, *held* not overcome by testimony from the ship as to a mistake in the bill of lading, or that she delivered all taken on board so as to exonerate her from liability for an apparent shortage in delivery.

**2. SAME—DAMAGE TO CARGO—IMPROPER STOWAGE.**

A vessel *held* liable for damage to a cargo of coffee resulting from its having been by the master's orders stowed on the bottom of a hold without dunnage, and from a leaky water tank.

In Admiralty. Suit for charter hire.

Convers & Kirlin and John M. Woolsey, for libellant.

Butler, Notman & Mynderse, for respondents.

ADAMS, District Judge. This action was brought by the Dowgate Steamship Company, Limited, as owner of the steamship Ludgate, to recover from Arbuckle Brothers, certain hire said to be due under a charter party dated London, March 9, 1906, wherein the Ludgate was chartered "for a voyage from Rio de Janeiro and/or Santos and/or Victoria in order named to the port of New York." The steamer duly loaded at the respective ports and sailed therefrom April 20, April 28, and May 9, 1906 for New York where she completed discharging about June 15, 1906. The hire was duly paid except a sum of $1,427.63 that was retained by the respondents to cover an alleged shortage and damage to the cargo as follows:

| | |
|---|---:|
| 124 bags Santos coffee short delivered @ 131 lbs. per bag 16,244 lbs. @ 8¢ ..... | 1,328.86 |
| Labor cleaning 661 bags damaged coffee 200 hours @ 25¢ ..... | 50. |
| 661 new bags @ 5¢ ..... | 33.05 |
| Difference in value 8 bags skimmings owing to lack of dunnage.... | 15.72 |
| | $1,427.63 |

There is no dispute between the parties excepting such as is indicated in the foregoing list of claims against the hire. These may be divided into two classes, first, with respect to the short delivery, and second, that relating to damaged coffee.

### Short Delivery.

The claimed short delivery consisted of 124 bags. The shipments at Rio and Port Victoria were of bagged coffee and bulk coffee; at Santos it was, according to the bill of lading, 42,501 bags. The total bags claimed to have been shipped were 5,000 at Rio, 42,501 at Santos and 7,644 at Port Victoria, making 55,145 in all. It is now undis-

puted that 55,021 bags were discharged in New York, leaving the 124 bags to be accounted for.

The libellant claims that the steamer was not a common carrier but a special carrier. This being so, however, it does not tend to relieve the libellant from an obligation to pay for the cargo receipted for, unless it can show that all the cargo received was delivered and consequently that the receipt was erroneous. It seeks to sustain the burden by showing that at the port of Santos her master, owing to a clerical error or an obscure figure in the mate's receipt for the last day of shipment, signed a bill of lading showing a total of 42,501 bags received at that port, whereas it is claimed he should only have acknowledged 42,301. The difficulty in this claim is that, if accepted, the vessel must necessarily have delivered 76 bags more than she received, that being the difference between the alleged excessive receipt for 200 bags and the 124 bags actually short in the delivery.

It is well settled that a ship is liable only for the cargo received, but where a bill of lading states a definite quantity as having been received, it binds her for such quantity until it is proved that it was not received on board. Goodrich et al. v. Norris, 10 Fed. Cas. 609; Smith & Co. v. Bedouin Steam Nav. Co., Ltd., Appeal Cas. 1896, p. 70.

Apart from the bill of lading, which is prima facie proof that the quantity contended for by the respondents was actually loaded on the vessel, there were various corroborating documents put in evidence by the respondents of the transactions at Santos, under a stipulation, of which the following is a copy:

"It is hereby stipulated between the proctors for the respective parties that the statements hereto annexed may be read by either party on the trial of this cause as the evidence of the persons who have signed the statements, with the same force and effect as if the signers thereof had testified thereto; subject, however, to objection by either party as to the materiality, relevancy or competency of the matters referred to in the said statements or any of them.

It is further agreed that the waiver of the right to cross-examine the persons who signed the annexed statements will not be taken as an admission by the libellant of the verity or correctness of the statements."

The documents, thus stipulated in evidence, consisted of a copy of the mate's receipt for 223 bags, and of statements and certificates sent to the respondents by their chief coffee shipper, their agent in charge of the Santos office; a clerk in charge of steamer's attendance; their general clerk in charge of office; some cables between the respondents and their agents at Santos; a statement from their junior clerk; a statement of the carters who transported the coffee that they delivered 2896 bags to the vessel; a certificate from the Santos Docks Company that it had receipts from the ship's mate in its possession showing that 39,605 bags (the above 223 bags were a part of this amount) were shipped from certain of its stores on the vessel; a certificate from the administrator of Export Revenue showing that according to the written declarations of the Fiscal Guard on the back of the notes of despatch 42,501 bags were shipped, also a certificate from the Companhia Docas de Santos showing that taxes were paid on 42,501 bags.

All the foregoing statements, certificates, etc., tend to show that the quantity placed on board the steamer at Santos was 42,501 bags. The first mentioned 223 bags were sent from Warehouse No. 4 by freight wagon; 1334 bags were carried on board from Warehouse No. 11; 38,048 bags were carried on board from Warehouse No. 12, and 2869 bags were from carts, carrying about 20 bags each, which made the quantity received and tallied into the steamer 42,501 bags.

The statement of C. W. Walker, the respondents' agent in charge of the Santos office, mentioned above, which is a summary of the Santos situation, was as follows:

"I am in charge of the Santos office of Arbuckle & Co.

The steamship Ludgate was lying opposite Warehouse No. 12 of the Companhia Docas de Santos during her loading, except upon the last day, when she was shifted and lay between Nos. 11 and 12 to facilitate the loading. Our records and the records of the Warehouse Company show that the coffee was shipped as follows:

From Warehouse No. 4, sent down by freight wagon............    223
From Warehouse No. 11, carried on board direct................   1334
From Warehouse No. 12    "    "    "    "    ................  38048
From carts carrying usually 20 bags each .....................   2896
                                                                ───────
Total quantity shipped and tallied into the steamer............42501B

The original receipts signed by the officers of the Ludgate were surrendered by us to them in exchange for the bills of lading signed by the captain. These receipts are not in our possession.

As to the statement of the captain that he demurred to signing the bills of lading, I can say that there was absolutely no discussion or question of the coffee on board not being correct. The captain waited in our office until the last receipt came from the steamer and then and only when he had it in his possession did he sign the bills of lading. The assertion that he had a question with our steamship clerk as to the tally is untrue in every particular. The final receipt was brought to our office by one of our clerks who was down at the steamer waiting for the last of the coffee to go on board. The first mate of the steamer Ludgate was aware how many bags of coffee were needed to complete the shipment. The captain was waiting in our general office and I would have been aware of any discussion. Furthermore, any such discussion would have taken place before the whole office staff. No such discussion took place.

As to the testimony of one of the mates of the steamer Ludgate that he had a conversation with me about shipping 200 bags aboard S S Tennyson, I say that it is absolutely false. We do not ship coffee from Santos by any steamer except such as we charter. That there could have been no such discussion is shown by the fact that the steamer was not taking a full cargo from Santos. We had instructions from our Rio house under date of 16 April 1906, that we were to leave the bunker space clear, calculated to take 6,000 bags, and put 5,000 bags in Hold No. 2, leaving the balance of space, calculated at 14,000 bags, for Victoria. We had positive instructions what space to leave and what to use, and we only shipped enough to fill our space allotment. Therefore, no such question could have arisen. We made no attempt to ship all the coffee which we had in store at this time, and when the Ludgate sailed we had 11,750 bags on hand in store.

The method of piling the coffee in the warehouses is as follows:

The coffee in the Docas is blocked out to suit the quantity which is to make that particular lot and piled 10 high. This is done with great regularity and it is impossible to make a mistake in tallying out the coffee as the total quantity of coffee in the pile is marked on the corner of the pile and then only one row is taken off at a time and then as the mate of the ship counts it he gives a receipt for it. Then only is that row broken into and

carried on board and the row behind is not touched until the first one has been carried on board.

The Companhia Docas de Santos are practically Government Stores, and once coffee is deposited there it cannot be withdrawn except to go on board steamers unless by special permission."

The second mate of the steamer who did most of the tallying at Santos, testified:

"Q. Now, after counting in the stack, how do you know they got in the steamer? A. There were too many people about the deck, seeing that they did come, for any mistake to be made; and they could not get off the dock.

Q. You watched them carried in? A. Yes. I was at the door of the shed most of the time, except when I was tallying the carts.

Q. So you are satisfied they got on board the steamer? Is that it? A. Yes."

The main reliance of the steamer in exculpation of herself is that she delivered all the cargo which she had received; that none had been stolen; that the master on the last day of loading, had signed for 2503 bags instead of 2303. If the latter were accepted, it would show, as above stated, that the steamer had delivered 76 more bags than she had received. These defences can not, in a case where the evidence of the quantity delivered is so persuasive as it is here, be overcome by a suggestion of mistakes in tallying at the place of loading on account of the extent of the cargo. If the claim for an excess receipt having been given for the quantity laden on board at Santos should be allowed, an unaccountable discrepancy would exist as to the 76 bags, above mentioned, which of itself would cast suspicion upon the 200 bag claim.

There are other circumstances which tend to overcome the libellant's claim.

The tally books of the steamer show an excess of receipts over either 42,301 as claimed by her or 42,501 as shown by the bill of lading. The last day's total entry was 2303 bags; this consisted of items 869, 300, 514 and 620. The mate could not account for the item of 620, although he could for the others, as well as in other instances, nor explain where he obtained it from. The entries, therefore, upon which the steamer depends to sustain the shortage are unreliable.

It appears that the mate's original receipt, which was returned to the steamer, when the bills of lading were signed, was destroyed two days after sailing subsequent to the delivery being completed here and she had sailed for Norfolk. The mate of the steamer was notified of the shortage of 124 bags while she was still here and the destruction of the receipt was probably two days later. The effect was that this important paper could not be produced for an examination by the court through the steamer's act.

No aid is given to the matter by any suggestion that a mistake occurred through some of the bagged coffee having burst or been emptied into the bulk cargo because a careful tally was kept of the bags and the steamer was given credit for all bags delivered, including torn and empty ones, and this was verified by the weights delivered which, after making some allowance for the drying out of the green coffee during the voyage, still was deficient to a considerable extent.

The greatest effect that can be given to the libellant's contention that when the cargo was discharged, the steamer had clean holds and actually delivered all that she had received, does not suffice for exculpation in view of the opposing evidence. If the contention were established, it would of course relieve the steamer, but unfortunately there is too much doubt of the fact to permit it to prevail. The case in principle is similar to The Titania, 131 Fed. 229, 65 C. C. A. 215, where the court said (page 231 of 131 Fed., page 217 of 65 C. C. A.):

"As before stated the bills of lading were prima facie evidence of the receipt of the hemp. We have, however, examined the testimony upon this question sufficiently to conclude that the weight of evidence, irrespective of the bills of lading, tends to show that the goods were actually on board at Manila."

## Damage to Cargo.

The testimony shows that damage was done to some of the bagged coffee through its not having been dunnaged but stowed directly on the floors. It appears that at Santos the shippers had called the master's attention to the necessity for dunnage in the bottom of the hold on the floor and that he had agreed to take the responsibility for any damage that might arise from such want of dunnage. Damage also occurred from the unseaworthy condition of the fore peak tank, which leaked and permitted some water to run into the No. 1 hold. The libellants were responsible for the damage arising from these causes.

There will be a reference to ascertain the amount of the respondents' loss and when that is ascertained, a proper decree will be entered.